## Tennessee Cent. Ry. Co. v. Hancock's Adm'x.

(Decided May 31, 1932.)

(As Modified on Denial of Rehearing Nov. 15, 1932.)

J. W. DOWNER for appellant.

H. W. LINTON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

R. C. Hancock was killed when an automobile in which he was riding struck a pillar of a railroad underpass on highway No. 41-W, a few miles south of Hopkinsville. His administratrix recovered a judgment for $5,000 against the appellant, Tennessee Central Railway Company, on the ground of negligence in erecting and maintaining the viaduct.

When the railroad was built in 1903, a change was made in the highway, and the bridge was built to avoid a grade crossing. It is about 87 feet between the extreme piers. The middle supports are two spans of fabricated steel columns, on concrete foundations, sitting diagonally with the track, but parallel with the road which runs between them. The highway on either side of the underpass is from 20 to 24 feet wide, but the paved surface is only 18 feet. The distance between the columns is 18 feet, narrowed to 17 feet at the base for a height of 18 to 20 inches. Travelers approaching the underpass from the north (as was the decedent) can see the left-hand pier from a point about 114 feet back, and can see both supports and a clear passage through when they get 80 or 85 feet away. Beginning a quarter of a mile north, at Steger's store, the highway is practically straight and parallels the railroad. It declines toward the underpass on a 5 per cent. and then 2 per cent. grade until it gets within a short distance of the underpass where it is level from there on through it. Beginning about 115 feet north, the road begins to gradually curve to the right, and goes straight through the underpass on a 45 degree angle, and then turns to the left and proceeds along the west side of the railroad. The railroad fill, or wing of the underpass, constructed of loose rock extends out from the structure on the inside of the curve in the road, and forms some obstruction to the view of the supports of the viaduct. The situation and the structure have been vividly presented to us by several photographs and an accurate map.

The decedent was riding on the front seat of the automobile of a neighbor, Crews, who was driving at the time of the accident. On the back seat were two colored men. The party had gone to Hopkinsville from their homes in the southern part of the county that morning, but by a different route. They were returning home, and reached the point of the accident about six o'clock in the evening of November 4, 1929, at which hour it was twilight. In addition to the naturally poor visibility at that hour of the day, the vegetation along the roadside was a faded gray, about the same color as the roadbed. Lines of telephone poles on each side of the road continued straight ahead beyond the curve instead of crossing the railroad with the highway, thereby giving the appearance of the road continuing beyond through the lane of poles thus formed. This condition, it is said, deceived the driver, who was not very familiar with the road, although he traveled it once in a while, and knew that there was an underpass somewhere along the way. The automobile had been used only about two months, and had been serviced that day in Hopkinsville. The witnesses for the plaintiff testified that the car was traveling 35 or 40 miles an hour, with the lights burning, as it approached the underpass. None of them realized that an underpass was ahead until they got within 60, 80, or 90 feet of it. The driver testified that, when he realized the situation and saw that he could not make the complete turn, he applied the brakes and reduced his speed. The brakes were in good condition. One witness said that marks of skidding were left on the road but for what distance is not disclosed. The automobile struck the left-hand steel column of the underpass with such terrific force as to practically destroy it. All of the men in it were injured, and Hancock died from his injuries about twelve hours after the accident. There is conflicting evidence as to whether there were any road signs indicating the approach to a curve. Several automobile mechanics and drivers testified that an automobile of the kind involved traveling at 40 miles an hour could be stopped within from 30 to 50 feet. But Crews stated it would take from 100 to 120 feet to come to a dead stop. He testified that he was perhaps 30 yards from the underpass when he realized he was approaching it.

Engineers testified that the underpass was a standard, approved type, in common use, and the most suitable for the place. They explained that, if the space

between the supports on either side of the highway as it passes under should be widened, much larger girders would be necessary, and the head clearance would be reduced to a point of danger. Without objection, the company was permitted to prove that there had not been a similar accident at the place.

The fifth division of section 768 of the Statutes gives railroad companies authority to construct their roads upon or across any highway in the state. It is the duty of a company having exercised that power to maintain the crossing in a reasonably safe condition for public travel. Paducah & Elizabethtown R. Co. v. Commonwealth, 80 Ky. 147; Commonwealth v. Louisville & N. R. Co., 109 Ky. 59, 58 S. W. 478, 22 Ky. Law Rep. 572; Louisville & N. R. Co. v. Muncey, 229 Ky. 538, 17 S. W. (2d) 422, 426. It was under the duty not to create a dangerous nuisance or hazard and not to impede or obstruct the reasonably safe and convenient use of the highway.

In Louisville & N. R. Co. v. Muncey, supra, it was held that the same duties regarding the maintenance of a public crossing at a grade established after the highway was built are imposed upon a railroad company with respect to an overhead footbridge constructed by a city and its citizens with the consent of the company after the railroad was built. The company had originally erected an underpass, and it is observed, arguendo, in the opinion that: "If nothing else had happened thereafter, the railroad company was under the duty only to maintain the underpass in a reasonably safe condition."

The separation of the grade was and is a distinct advantage to the public. That the underpass was safe and suitable when erected in 1903, several years before there was an automobile in Christian county and before motor vehicles had become in general use, cannot be doubted. The legal question arises as to whether the company can be held responsible if the underpass and its approaches became dangerous through changed and changing traffic conditions; that is, the almost universal substitution of automobiles as a means of travel.

The principle is laid down in Cooke v. Boston & Lowell R. Corp., 133 Mass. 185. There was a divided underpass beneath a railroad built in 1832 and crossing a street which had been in use more than two hundred

years. In 1880, the driver of a horse-drawn omnibus was injured when his body came in contact with a part of that bridge. It was contended by the railroad company that, although liable under its charter, granted by the Legislature, to construct and maintain its railroad so as not to obstruct or impede the convenient use of any highway it might cross, such liability was imposed, in view of the public travel upon the highway at that time and suitable for conveyances then in use; and that, since such an omnibus as the plaintiff was driving was unknown at that time, the company could not be held liable. Denying the claim, the court said:

"The Legislature intended to provide against any obstruction of the safe and convenient use of the highway, for all time; and if, by the increase of population in the neighborhood, or by an increasing use of the highway, the crossing which at the outset was adequate is no longer so, it is the duty of the railroad corporation to make such alteration as will meet the present needs of the public who have occasion to use the highway."

See, also, St. Louis, I. M. & S. R. Co. v. Smith, 118 Ark. 72, 175 S. W. 415; Virginian R. Co. v. Farr, 147 Va. 217, 136 S. E. 668; Elliott on Roads & Streets, secs. 48, 1011.

Here the common-law duty which rested on the appellant was the same as that which the Legislature imposed on the Boston & Lowell Railroad in the case cited. The duty assumed years ago not to obstruct unreasonably the safe and convenient use of the highway at that point has been and is a continuing one. As changes in the ordinary and usual mode of travel may have rendered the crossing and structure dangerous, the duty rested upon the company to meet those changed conditions and the exigencies of modern travel. And if by reason of a failure to do so the company failed to use ordinary care not to hinder the present reasonable use of the highway and did not meet the reasonable requirements which that use demanded, then it must be held answerable for any resulting damage to one to whom the duty was owing.

In Pugh v. City of Catlettsburg, 214 Ky. 312, 283 S. W. 89, 91, 46 A. L. R. 939, a railroad viaduct crossed the street diagonally with a pier in the center of the street which left a passageway 13 feet wide on each

side, although the paved portion of the street as it approached the underpass was 30 feet wide. Construing section 768 of the Statutes, referred to above, authorizing the railroad company to cross a city street upon such terms as might be agreed upon by it and the city, it was held in the opinion that, if the structure was built and maintained in accordance therewith, neither the city nor railroad company was liable in an action for negligence, unless the plan adopted was manifestly unsafe or dangerous. Continuing, it is said:

> "The intersection was at an acute angle, which required a long span with heavy girders, perhaps reducing the height of the trestle or the placing of piers in the center of the street. This matter was intrusted to the sound discretion of the city council, and as the plan adopted afforded ample space for public travel, and is a type of construction similar to that in use in cities of this state and elsewhere, we cannot say that it was manifestly unsafe; hence its construction does not constitute a public nuisance."

See, also, Lorentz v. Public Service R. Co., 103 N. J. Law, 104, 134 A. 818, 49 A. L. R. 989.

Measuring the duty as of the time of the accident, it is difficult to perceive any negligence on the part of the defendant to have been established. The condition disclosed in the record was not intrinsically dangerous or hazardous. The space between the piers was practically the same as the paved surface of the highway. The approach to it was not abrupt or sudden. The situation was visible for such a distance as would enable any one traveling at a reasonable rate of speed to bring his car to a complete stop if that should become necessary. The railroad company has but exercised its legal powers, and does not appear from this record to have violated any duty in erecting or maintaining the viaduct, or in meeting the requirements which ordinary use of the highway by those exercising due care for their own safety and security demands, although perhaps the highway may be less safe at the point than it would if there were no railroad crossing there. The mere occurrence of an unfortunate accident at the place is not sufficient to require the payment of damages by the railroad company. The court is of the opinion that

the verdict is flagrantly against the evidence. We reserve decision of other points raised.

The judgment is accordingly reversed for consistent proceedings.