## BECKER v. ILLINOIS CENT. R. CO.*
### No. 14516.

Court of Appeal of Louisiana. Orleans.
April 10, 1933.

Lemle, Moreno & Lemle, of New Orleans, R. V. Fletcher, of Chicago, Ill., and Charles N. Burch, H. D. Minor, and Clinton H. McKay, all of Memphis, Tenn., for appellant.

James G. Schillin, of New Orleans, for appellee.

JANVIER, Judge.

Plaintiff is the owner of an automobile truck which was practically demolished when it was driven into the center supporting pier of an overhead railroad trestle on which there were located tracks of defendant, Illinois Central Railroad Company, and which trestle crosses the Jefferson Highway just below the town of Harahan in this state. Although the driver of the truck was an employee of plaintiff, he was, at the time of the accident, not acting within the scope of his employment, and in fact had taken the truck for his own pleasure and without Becker's knowledge or consent.

The accident occurred at night, and at the time there were in the cab of the truck four persons, McAllister, the driver, Mr. and Mrs. Gautreaux, and Miss Margaret Abadie. Becker seeks to recover from defendant $910, which, he alleges, was the value of the truck, and he charges that liability rests upon defendant because of the maintenance by it of an illegal and dangerous obstruction in the public highway, to wit, the center pier of the said trestle, and also because of the alleged failure to properly and adequately light the said pier.

That the accident occurred is, of course, admitted, but it is denied that the truck was damaged to the extent alleged, and it is particularly asserted that defendant is not the owner of the said pier and is not legally responsible for its presence. It is also maintained that the said pier is erected on the private property of defendant; that is to say, the small strip of ground in the center of the highway on which the pilings forming the said pier rest, and on this alleged fact is based the argument that, even if defendant is legally responsible for the presence of the pier, it cannot be held liable, since the obstruction is not in the highway, but is on the private property of defendant.

It is also alleged in the answer that the said pier was properly and adequately lighted and is not a dangerous obstruction to a person exercising ordinary care in driving upon the highway. Finally it is charged that the legal, proximate cause of the accident was the negligence of the driver of the truck in not exercising any care or caution and in not looking ahead. In the district court judg-

---

*Rehearing denied May 22, 1933.

ment was rendered for plaintiff for $335, and from that judgment defendant has appealed.

Several other suits have resulted from the same accident, and all but one have been consolidated with this for convenience in argument. That of the driver of the car was decided in favor of defendant, and no appeal was taken. But in each of the others one of the guest passengers in the truck sued, and in each judgment for the plaintiff was rendered in the district court.

Defendant concedes that the truck had been taken without the knowledge and consent of plaintiff, and that therefore, since the driver was not acting within the scope of his employment, any negligence on his part cannot be chargeable to the owner, and that hence, if we reach the conclusion that the pier constitutes an illegal obstruction and that its presence is chargeable to defendant and that it was improperly lighted and that there was legal, causal connection between the said pier and the accident, then the fact that the driver was at fault either in the matter of speed, or because he failed to maintain a careful lookout ahead, would not prevent recovery.

■The roadway, except at the point at which it passes under the trestle, is 20 feet in width. At the trestle it is divided by the center pier into two driveways, one 12 feet wide and one 11 feet 9 inches, so that the two driveways have a total width available to vehicles of 23 feet 9 inches. While there is some testimony tendered for the purpose of showing that the red lights placed about five feet from the ground, one on each end of the pier, had, on one or two prior occasions, been left unlighted, the overwhelming preponderance of the evidence shows that at the time of the accident the light on the end towards which the automobile truck approached was burning, and it is shown that it was a standard red switch light in use on railroads, and could be seen for a half mile or more. Whether the road on the side from which the automobile truck approached was straight is, strange to say, a much disputed question, but, after a personal examination which we were invited by counsel to make, we reach the conclusion that to all intents and purposes the roadway is straight for more than a quarter of a mile, and that the red light was plainly visible for at least that distance. It appears, then, that, as the truck approached the trestle, the driver, had he maintained a lookout ahead, could have seen the warning light when he was more than a quarter of a mile from it, and that at no time while he was traversing that distance was there anything to obstruct his view.

There was evidence tending to show that the light was so located as to cause possible confusion, and that it sometimes had the appearance of being the tail-light of an automobile and at others led one to believe that it was located on one side of the roadway and not in the middle. We believe, however, that the light was properly located and could not cause confusion to a careful driver. Still, if those in the truck had testified that they saw the light and were confused by it, we might have concluded that such confusion had some connection with the accident, but they all said that they did not see the light at all, and, if they did not see it, it needs no argument to show that they were not confused by it. In fact, that they did not see it is conclusive proof that they were not looking ahead, because they must have seen it had they looked. The driver, McAllister, when asked what, in his opinion, caused the accident, said that it happened because the pier was not sufficiently lighted. Yet, as we have said, the overwhelming testimony shows that there was on the pier and directly facing McAllister a standard switch light with a four-inch red lens, which could be seen more than a quarter of a mile away.

■ In addition to failing to look ahead, the driver of the truck was plainly negligent in that he must have been operating it at an extraordinarily fast rate of speed. Those who were in it state that the speed was moderate, and there were no others who were eyewitnesses. But the fact remains that, as a result of the impact, not only was the truck itself practically demolished, but the entire center pier of the trestle, consisting of some ten very large timbers more than twelve inches square, braced and bolted together and placed on large sleepers, was knocked more than an inch out of place, with the result that the railroad tracks overhead were found to have been knocked out of line. It is impossible to believe that such damage could have resulted had the truck been operated at the modest rate of speed claimed by the passengers in it.

■ It must be conceded that, if there had been no center pier there could have been no collision therewith, but it does not follow that, because there was a pier, its presence can be said to have been the proximate cause of the collision. It might as well be said that, had the truck not been manufactured, it could not have run into the pier, and that therefore the manufacturers, because they made the truck, are chargeable with the accident.

There must be overhead trestles, and there must be other obstructions near highways without which all such highways would, of course, be more safe. If all roads could be absolutely straight and could be built without any structures of any kind on or near them, of course there would be fewer accidents, but it does not follow that those who build roads with curves in them, or those who maintain necessary objects near them, are liable for all accidents in which such curves or such obstructions are remotely concerned. That the mere fact that the road-

way would be safer without such piers does not render a railroad owning such piers liable was held in a case closely resembling this, Tennessee Central Railway Co. v. Hancock's Administratrix, 245 Ky. 426, 53 S.W.(2d) 708, 710, in which the court said: "Measuring the duty as of the time of the accident, it is difficult to perceive any negligence on the part of the defendant to have been established. The condition disclosed in the record was not intrinsically dangerous or hazardous. The space between the piers was practically the same as the paved surface of the highway. The approach to it was not abrupt or sudden. The situation was visible for such a distance as would enable any one traveling at a reasonable rate of speed to bring his car to a complete stop if that should become necessary. The railroad company has but exercised its legal powers, and does not appear from this record to have violated any duty in erecting or maintaining the viaduct, or in meeting the requirements which ordinary use of the highway by those exercising due care for their own safety and security demands, although perhaps the highway may be less safe at the point than it would if there were no railroad crossing there. The mere occurrence of an unfortunate accident at the place is not sufficient to require the payment of damages by the railroad company. The court is of the opinion that the verdict is flagrantly against the evidence."

The question to be determined is whether the obstruction proximately caused the accident, or whether the cause was some independent, intervening act of some one else, which act, in the eyes of the law, was the actual or proximate cause.

In a very interesting case in which this question arose, Orton v. Pennsylvania Railroad Co. (6 Cir. Ct. App.) 7 F.(2d) 36, 37, the court considered whether a railroad company should be held liable to a guest in an automobile when it struck a train which was obstructing a highway. Under the state statute it was a misdemeanor, and therefore negligence, for a railroad to obstruct such a highway for more than five minutes. The court said: "If we assume that the obstruction was wrongful—amounting to a nuisance under the first-mentioned statute or in any event negligence, which is immaterial—the question is whether the collision followed as a natural and probable result that ought to have been anticipated or, as contended by defendant, an intervening negligent act was the sole proximate cause of it. The general rule is that if a new and independent force, acting in and of itself, intervenes, causing an injury, it will be regarded as the proximate cause. [Louisiana Mut.] Insurance Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65; Goodlander Mill Co. v. Standard Oil Co., 63 F. 400, 11 C. C. A. 253, 27 L. R. A. 583; and authorities cited."

In Phillips et ux. v. Davis, Agent (3 Cir.

Ct. App.) 3 F.(2d) 798, 799, 40 A. L. R. 1241, is found another case in which it was sought to hold liable a railroad company whose train was illegally obstructing a crossing. The automobile ran into the side of the train. The court said that, although the railroad company was negligent in allowing its train to block the crossing, "the proximate cause of the accident was obviously the lack of care exercised by the plaintiff driver and by his wife. * * *"

In Davis, Agent, v. Schroeder, 291 F. 47, 48, the United States Circuit Court of Appeals for the Eighth Circuit, composed at that time of Judges Kenyon, Lewis, and Sanborn, considered facts which presented the identical question which we are now discussing.

Plaintiff was a guest passenger at night in his brother's automobile. They were some distance from the railroad crossing at which there were crossing gates. One of the gates was lowered, but there was no light on it. Another automobile driven by one Jones, approached the crossing at high speed; Jones being unaware of the fact that the gate was lowered. When he suddenly realized that the gate was ahead of him and that he was almost certain to strike it, he "attempted to avoid the gate and ran into the automobile in which plaintiff was riding." The court said that: "The crucial and controlling question is: Was the alleged negligence in permitting one arm of defendant's gates at Lindell boulevard to be down, without light or warning thereon, the proximate cause of plaintiff's injury? The answer to this question is decisive of the controversy. There is little use of reviewing the many cases where the question of proximate cause is involved. There are differences in every case, and ofttimes the case turns on a slight difference of facts."

After quoting from many decisions in which there was pointed out the distinction between negligence which is the proximate cause and negligence which is merely incidental to the ultimate result, the court said: "Tested by the principles of these decisions, this case presents little difficulty. The proximate cause of plaintiff's injury was not the alleged negligence of defendant in permitting the gate to be down, but it was the reckless and unlawful act of Jones in driving an automobile at a rate of speed in violation of the city ordinances. It was a new, efficient, and independent cause, entering between the alleged negligence and the injury, and was not reasonably to have been anticipated. Granting that the railway company was negligent in permitting the arm of the gate to be down, could it be reasonably apprehended or foreseen that a party would approach in an automobile at a speed forbidden by the ordinances of the city. * * *"

We may likewise say here that, granting that the railroad company was negligent in

permitting the pier to be erected in the highway (which cannot be granted as a matter of fact), could it be reasonably apprehended or foreseen that a person would approach in an automobile without maintaining the slightest lookout ahead? It is not to be presumed that a person will operate an automobile without looking ahead any more than it is to be presumed that a person will operate one at a speed in excess of legal limits. If, in the one case, the reckless speed is the proximate cause of the accident and the obstruction only incidental, why cannot it be said in the other that the failure to look is the proximate cause and the obstruction merely incidental?

That the structure was lawful when erected seems clear from the evidence, and, in fact, it is not seriously disputed that the state highway department has recognized that the duty of removing the pier, if such is necessary, or when such becomes necessary, rests upon that department, and it is abundantly proven that its reason for not having already removed the structure is that its officials do not feel that the slight additional hazard is sufficient justification for the expense which would be entailed in its removal.

In Pugh v. City of Catlettsburg et al., 214 Ky. 312, 283 S. W. 89, 91, 46 A. L. R., 939, a case much like this, the Supreme Court of Kentucky said: "One of the greatest problems in urban traffic is to avoid congestion and to eliminate dangerous crossings at grade, and immense sums are expended in constructing under passes and overhead grades at such places. Here it was necessary for the railway company to raise its tracks in order to secure the proper grade approaching ·its bridge over the Big Sandy river, and from the standpoint of safety for the traveling public an overhead bridge was desirable. The intersection was at an acute angle, which required a long span with heavy girders, perhaps reducing the height of the trestle or the placing of piers in the center of the street. This matter was intrusted to the sound discretion of the city council, and as the plan adopted afforded ample space for public travel, and is a type of construction similar to' that in use in cities of this state and elsewhere, we cannot say that it was manifestly unsafe; hence its construction does not constitute a public nuisance."

Similarly, in Lorentz v. Public Service Railway Co., 103 N. J. Law, 104, 134 A. 818, 820, 49 A. L. R. 989, the Supreme Court of New Jersey said: "It seems therefore clear, and indeed is not denied, that this elevated structure is a lawful structure erected pursuant to lawful public authority and essentially similar in characteristics to the elevated railroads in New York, Boston, Philadelphia, Chicago, and perhaps other large cities. Structures of this kind, authorized by law and used to facilitate public travel, .although. they are physical obstructions to drivers of ordinary vehicles and perhaps to pedestrians, are nevertheless not nuisances, and the public must take notice of them."

That the structure was not in itself a hazard in the sense that accidents might be expected to result from its presence is shown by the testimony of many witnesses. Mr. Robert, who, as state highway engineer, had approved the plans for the roadway passing under the trestle, said: "When I approved the plans, I regarded the underpass as good construction. It had a twelve-foot driveway on each side and I thought it was safe."

Mr. Caldwell, construction engineer of the highway commission, said: "I don't consider it dangerous at all; any more so than driving anywhere else."

Mr. Marriott, a civil engineer in the employ of defendant, Illinois Central Railroad Company, said that in a majority of cases where railroad tracks pass on overhead trestles across highways there is a center pier, and he further, in answer to the question, "Isn't it common sense that it is more dangerous to have a post in the middle of a paved highway than not to have one?" said, "If it is, there seem to be many people scattered over this country that are making great mistakes in the construction of important highways and streets."

The record shows, in fact, that in the city of New Orleans there is at least one other overhead structure of this kind which has supporting piers and which piers are placed in a much-used public highway, and we may remark, in passing, that the record shows that the piers in the case to which we refer (at West End) bear no red lights to warn approaching automobilists.

The highway passing under the structure was apparently approved by the United States Bureau of Roads, because that Bureau, before authorizing federal aid to be given for state roads, goes over the plans and refuses to approve the rendering of federal aid if objectionable structures are permitted to exist, and in this case federal aid is shown to have been granted for this particular road.

We find additional expressions of the opinion that the so-called obstruction is not unduly hazardous in affidavits which are in the record, one made by the sheriff of the parish of Jefferson, Hon. Frank J. Clancy, another made by Hon. Frank Mayo, mayor of the town of Harahan, and a third by August Hagelberger, operator of a filling station at Harahan. In the affidavit of Sheriff Clancy we find the following: "The slight curve just south of the viaduct does not amount to anything, does not prevent the red light from being seen, and, in my opinion, does not in any way make the situation dangerous, and I do not consider the situation dangerous."

Hon. Frank Mayo, the mayor of Harahan,

in his affidavit says: "If any one should hit the center piling it is because they are not looking, because if they look there is nothing to prevent them from seeing the red light at night."

Mr. Hagelberger expresses the view that any one who is sober and reasonably sane would be in no danger. He says: " * * * The row of piling in the center of the road does not create a dangerous situation, because of the bright red lights thereon, for any automobile driver who is sober and reasonably sane, and who is paying the slightest attention to where he is driving."

■ Nor do we believe that the situation is affected either by Act No. 157 of 1910, nor by Act No. 132 of 1918. The first act, that of 1910, imposes upon railways, etc., the duty of constructing their tracks over public highways so as not to obstruct their safe and convenient use. In the first place it appears that the railroad was constructed long before the highway was built under it, and, furthermore, we do not believe that the act could be construed as practically prohibiting constructions of this kind. There must be, as we have said, railroad crossovers, and therefore there must be and are governing bodies with the duty of approving such crossovers. In this case those governing bodies seem to have found no fault whatever with the construction.

The same may be said of the act of 1918, which merely requires that crossovers be built in accordance with specifications of the state highway department. As we have said, this department seems to have found no fault whatever with this crossover.

■ We note in the opinion rendered by our brother below the statement that: "It seems obvious that the pier so placed increases the hazards of the roads, and while it may very well be that intelligent, alert drivers will recognize the situation and avoid the danger by careful driving, the roads are filled with persons who do not reach that standard. I am not aware that a situation which is safe only for drivers of the highest class is sufficient to meet the duty which a railroad, so situated, owes to the general public not to add unduly to the hazards of the roads which it crosses."

We cannot agree with our brother below that the evidence shows that this particular road was safe only for drivers who had reached the highest standard of efficiency. On the contrary, it is shown that only two or three other accidents had taken place at this point, whereas several million cars had passed under the structure since its erection more than fifteen years prior to the happening of this accident. It would therefore seem that the structure is safe for all but the most careless drivers, and the rule which seems applicable to us is that that road is safe which can be negotiated by all but the most reckless and careless. Roads need not be built to suit the requirements of the most reckless and careless drivers, because those drivers will have accidents no matter how roads are built and no matter how free from obstructions highways may be. This road met the requirement of all but three or four of some three or four million drivers, and we therefore conclude that the experts were correct in stating that there was nothing inherently dangerous about its construction. We feel, therefore, that the proximate cause of the accident was the negligence and recklessness of the driver of the automobile truck, and, for this reason, the defendant company is not liable.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, annulled, avoided, and reversed, and that plaintiff's suit be dismissed, at his cost.

Reversed.

WESTERFIELD, Judge (dissenting).

I am of opinion that the viaduct, or overpass, as maintained by the defendant, was insufficiently illuminated and constituted a dangerous obstruction to traffic, and was an important factor in causing the accident.

I therefore respectfully dissent.

HIGGINS, Judge (concurring).

The evidence shows that the defendant had placed in the center of the pier a large red light which was burning at the time of the accident. It was visible for over 1,000 feet as one approached from the south; the road being practically straight, there being no obstructions, and the weather being clear at the time of the accident.

The driver of the truck and the other occupants thereof admit that they never saw either the red light or the pier, and that the truck struck both of them without the driver ever attempting to apply the brakes. While they testified that they were looking forward, it is self-evident that, if they had paid the slightest attention as to where they were driving, they would have seen the red light and discovered the pier. It is clear that they not only ignored the obvious red light, but also the pier which became visible for some distance because of the illumination from the truck's headlights.

A red light is the standard signal of danger. To the ordinary prudent driver it means that there is some hazard which requires him to take precaution and place his car under control. To say that the red light on the pier was an inadequate warning of this obstruction in the road would be equivalent to saying that the rear of every automobile that travels and parks on the public highways is

383

insufficiently lighted to warn those approaching from the rear of its presence.

I do not regard the pier in the center of the road as a trap or extraordinary hazard which would tend to confuse an ordinary careful and prudent driver, because, in addition to the red light located in the middle of it, there was sufficient room for an automobile to pass on either side of the pier.

I concur in the view that the plaintiffs are not entitled to recover because, conceding arguendo that defendant was guilty of negligence in placing the pier in the middle of the road, it is my opinion that the obstruction was properly and adequately lighted, and therefore the proximate cause of the accident was the negligence and carelessness of the driver of the truck in failing to keep a proper and effective lookout.