**BRANDON v. TEXAS & NEW ORLEANS R. CO.** *

**No. 1612.**

Court of Appeal of Louisiana. First Circuit.

June 30, 1936.

Brumby & Bauer, of Franklin, for appellant.

Rene H. Himel, of Franklin, for appellee.

DORE, Judge.

Plaintiff, the widow of Joe Brandon, a colored man of about the age of seventy years, filed this action against the defendant for damages to the amount of $10,-000, occasioned by the death of her husband after being struck by a truck being driven by one Clinton Dupuis near a crossing of a switch track over the Spanish Trail Highway, in St. Mary parish, at Shadyside Plantation.

The plaintiff bases her action against the railroad company, in that the said railroad company was negligent in failing to keep the crossing of said switch track over the said highway in proper repair; that the said crossing had always consisted of two standard gauge tracks about eight feet apart, and was first constructed across a dirt road which road was later graveled by the police jury of the parish of St. Mary; that in December, 1931, the Louisiana Highway Commission paved said road and in so doing laid the pavement to within eighteen inches of the first and last rails of the said switch tracks, leaving the rails about three inches higher than the pavement; that the highway commission built an abrupt gravel incline to pass traffic over said switch tracks, which was acquiesced in by said railroad company. It is further alleged that said crossing, on January 31, 1932, the date on which the injury occurred, was not and had never been in good condition; that the defect in said crossing was not apparent and could not be seen by a motorist driving along the said highway.

Plaintiff further alleges that the said Dupuis was driving a truck loaded with sweet potatoes on said highway, in the daytime, on the said January 31, 1932, going in an easterly direction and attempted to make the crossing at an excessive rate of speed; that the brakes on the truck were in bad condition, and when the said Dupuis struck said defective crossing, he lost control of the truck, which swerved to the left side of the road and struck the deceased on the left shoulder of the road some seventy-five or eighty feet east of the crossing, causing the injuries which resulted in the death of deceased on February 10th, following.

The defense of the railroad company can be safely stated to be: (1) That the defendant railroad was not the owner of the switch tracks alleged to have been defective; (2) the railroad company was not guilty of any negligence in fact or constructively; (3) the negligence of the truck driver was the sole or proximate cause of the accident.

The trial court rendered judgment for plaintiff and against the railroad company for $1,500. The defendant has appealed, and plaintiff has answered the appeal asking that the judgment be amended by increasing the amount to $4,500. Neither Dupuis nor the Louisiana Highway Commission were made party defendants to the suit.

From the pleadings and the evidence the following facts may be accepted without serious dispute: Dupuis was guilty of negligence in driving onto the crossing at an excessive rate of speed; in operating a truck with defective brakes with an overload, and in failing to see and slow down for the crossing. That the deceased was walking on the pavement east of the crossing when the truck approached from the rear; and, when the truck hit the crossing and got out of control of the driver, the deceased got over unto the left shoulder of the road in an effort to avoid the truck, but the rear part of the truck struck him on the left shoulder of the road as the driver was steering the truck back onto the pavement. That the deceased died from the effects of the injury.

As the divisions of the defendant's defense will cover the issues presented in the case, we will discuss them in the order named.

■ (1) On August 13, 1912, the Morgans' Louisiana & Texas Railroad and Steamship Company entered into a contract with the Shadyside Company in which the Shadyside Company conveyed to the said railroad company all of its rights, title, and interest in and to these switch tracks, together with all materials therein, including rails, splices, frogs, switch fixtures, cross-ties, etc., and the railroad company agreed to repair and maintain said switch tracks.

The defendant, the Texas & N. O. R. R. Company, obtained authority from the Interstate Commerce Commission, on December 28, 1926, to lease, control, and operate the railroad properties of the M. L. & T. R. R. & S. S. Co. The defendant railroad company is now operating said railroad, and, according to the testimony of Mr. Kemper, one of its officers, is using and keeping up the switch tracks in question.

It would therefore appear that the defendant railroad company is operating and in possession of these switch tracks as lessee instead of as owner as alleged in the petition. We do not consider this variance in the allegation of ownership in the petition and the proof of lessee as material, inasmuch as the railroad would be liable to keep the crossing in repair whether using the tracks as owner or lessee. On this point, we quote from Corpus Juris, vol. 51, par. 1149, p. 1096, as follows: "The lessee will be liable for injuries occurring during its operation of the road due to the defective condition of the track or roadbed, although such defects were in the original construction or existed at the time of the lease, as it cannot keep and maintain the tracks or roadbed in a dangerous condition and yet escape liability for injuries arising out of such condition upon the ground that it is the duty of the lessor to keep the tracks in proper order. While ordinarily the lessee is not liable for injuries to property due to the original construction of the road by the lessor, it is liable for injuries resulting from its own acts in making repairs or alterations upon the leased road, or its failure to perform its continuing duty to maintain the road in suitable and proper condition." The first defense of the railroad company is therefore not well taken.

■ (2) Act No. 157 of 1910, amending section 691 of the Revised Statutes, requires railroads to keep the crossings over public highways in such condition as not to hinder, impede, or obstruct the safe and

convenient use of such highways. A failure on the part of a railroad to keep such crossing in repair thereby causing injury to a traveler on such road, renders the railroad liable in damages. Darby v. New Orleans, T. & M. R. Co., 139 La. 213, 71 So. 490; Jones v. Tremont Lumber Co., 139 La. 616, 71 So. 862; Vandevender v. New Iberia & N. R. Co. (La.App.) 162 So. 601. The duty to keep the crossing in repair is a continuing duty on the railroad to be discharged whenever the condition of the crossing is in need of repair in order for it to be safe and convenient to the travelling public. Darby v. New Orleans, & M. R. R. Co., supra; Corpus Juris, vol. 52, par. 1778, p. 182.

■ Learned counsel for defendant contend that Act No. 157 of 1910 has been superseded or at least modified by Act No. 132 of 1918 and Act No. 95 of 1921 (Ex. Sess.) The former act authorizes and empowers the Public Service Commission to compel railroads to construct and maintain suitable crossings over the public roads of the state. Section 29 of Act No. 95 of 1921 (Ex.Sess.) the Highway Act, gives the highway commission, the police jury or town council the right to repair and maintain a railroad crossing over a highway and charge the cost thereof to the railroad, if the railroad neglects or refuses to make the repairs after fifteen days' notice. It is contended that, as no action was taken by the Public Service Commission, the highway commission or the police jury to force the railroad to make the repairs under these acts, the railroad cannot be held responsible for the defective condition of the crossing.

In our opinion, these two acts do not supersede Act No. 157 of 1910, nor relieve the railroad of its primary duty of keeping the crossing in repair, but these two acts are intended to give, and do give, certain departments of the state, parish, or municipal government the right to force the railroad to make the repairs and discharge its duty under the law as imposed by the act of 1910, and on the failure to so do, to have the repairs made at the expense of the railroad. In other words, these two acts merely afford a remedy by which the railroad can be compelled to perform its duty in keeping the crossings in good order.

■ The decided preponderance of the evidence is to the effect that the crossing was in bad condition. One witness says that it was one of the worst crossings. A motorist going fifteen to twenty miles per hour would receive a severe jolt when his car struck the crossing. Moreover, the fact that the principal defect in the crossing consisted of the sudden depression from the end of the pavement to the rails and the elevation of the rails above the level of the pavement, made it rather difficult for an approaching motorist to see the defect until within close proximity to the crossing. For this reason this case is not similar to the case of Becker v. Illinois Central R. R. Co. (La.App.) 147 So. 378, cited and relied on by defendant. In the cited case, it was held that a trestle pier placed in the center of the highway to divide traffic on the highway passing under an overhead railroad trestle did not constitute such an obstruction in the highway so as to render the railroad liable to a motorist running into this dividing pier. This conclusion was reached because of the fact that the pier was in plain view of the approaching motorist, easily observed by any one properly looking. The situation is quite different where, as in the present case, the defect consists in a depression in the pavement, and a rise in the rails above the pavement, which condition is not so easily detected by an approaching motorist. The evidence shows that the crossing was in a defective and dangerous condition.

In our opinion the most serious defense presented in the case is that, inasmuch as the defective condition of the crossing was made so by the highway commission, or the contractor acting under its authority, therefore the railroad company cannot be held responsible for this condition which it did not cause and over which it had no control. The pleadings and the evidence show that the eighteen-inch break from the end of the pavement to the outer rails of the two tracks was made under the direction of the commission, and the pavement was made some three inches lower than the rails in carrying out the plans and specifications prepared by the commission. Furthermore, the commission caused the gravel incline to be built by the contractor in order to permit traffic to pass over the crossing during the construction of the road. Under its direction a watchman was established or stationed at the crossing at night because of the dangerous condition of the crossing. The commission had complete charge of the whole road, necessarily including the crossing;

it had absolute authority of the road while under construction, it give the necessary orders, and no one could interfere with its orders or instructions.

The pavement had been completed some time in December, 1931, but the work of building the shoulders had not been completed when the accident happened a month or so later. The road was not completed until some three months after the accident, and permanently opened for traffic. While no work was going on on the day of the accident, it being a Sunday, yet the fact remains that the road at the crossing was in the course of construction and under the absolute control of the highway commission and the contractor at the time of the accident. Under these circumstances, was it the duty of the railroad to repair the condition made dangerous by the construction of the highway under the control of the commission and the contractor before the road construction was completed, immediately after the pavement was finished and before the road was opened up for traffic by the commission?

It must be remembered that the temporary crossing was prepared and opened to traffic by order of the commission and before the road was completed and accepted. No notice was given the railroad that the crossing had been opened to traffic, nor was any demand made to repair the crossing. The reason that the commission opened up the road at this point to traffic was because of the difficulty in making detours for traffic. The commission had signs at both ends of the project advising the traveling public that the road was under construction, and traveling upon the road was at their own risks.

█ The duty of a railroad company to keep a crossing in repair is expressed in Corpus Juris, vol. 52, par. 1780, at page 196, as follows: "In order to charge a railroad company with negligence for defects or obstructions at a crossing which it is bound to keep in proper condition and repair, it must appear that the railroad company had notice of the defect or obstruction, or should under the circumstances have had notice thereof, especially where the defect or obstruction is caused by a third person; and also that it failed within a reasonable time thereafter to repair or remove the same. The railroad company, is, however, chargeable with knowledge of defects or obstructions which by the exercise of due care it could discover, and it may, therefore, be liable in respect of such defects or obstructions even in the absence of actual knowledge. According to some cases, a statute imposing the duty on a railroad company to keep its crossings in repair requires such companies to take notice of the condition of the crossing and at all times to be informed as to any defects therein."

█ Assuming that the railroad had notice of the defective condition of the crossing, or that it was charged with such knowledge, had it a reasonable time in which to make the repairs? The crossing had been opened to traffic slightly over a month when the accident happened. During this time work was still being performed on the road and the road was under the control of the highway commission. It would have been necessary for the railroad company to remove the temporary crossing made by the contractor under orders of the commission and to lower its rails even with the concrete slab, fill in the eighteen inch space, and otherwise correct the condition made in the construction of the road—all of which it would have been necessary for the railroad to do within a month in order to have avoided the accident on January 31, 1932. Mr. Henderlite, the chief engineer of the highway commission, says in his deposition that it was customary in engineering paving projects to leave a gap and to construct metallic grade crossings later where railroad switch tracks crossed the highway. We are therefore of the opinion that within the short time between the opening of the road and the date of the accident the railroad company could not have been able to repair or construct the crossing and make it conform to the standard required by the highway commission.

Under the circumstances and facts of this case, we are of the opinion that the railroad company cannot be held negligent in failing to repair the crossing before the injury to the deceased occurred.

█ It is not to be understood that the control and supervision vested in the highway commission over the roads of the state has the effect of relieving a railroad company of its duty to keep crossings in repair, as that is a duty which the railroad owes to the public and the commission could not by its acts relieve the railroad of that liability to the public. Our conclusions are based on the fact, under the

particular circumstances of this case, that the railroad was not guilty of negligence in failing to repair the crossing before the accident occurred.

The conclusion reached by us renders it unnecessary to consider the other question presented.

For these reasons assigned, the judgment appealed from is annulled and set aside, and that plaintiff's suit be dismissed at her costs.

Rehearing Denied July 15, 1936.