### ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY v. SMITH.

## Opinion delivered April 5, 1915.

1. RAILROADS—DUTY TO MAINTAIN PUBLIC CROSSING.—It is the duty of every railroad company to properly construct and maintain crossings over all public highways on the line of its road in such manner that the same shall be safe and convenient to travellers, so far as it can do so without interfering with the safe operation of the road.

2. RAILROADS—DEFECTIVE CROSSING—INJURY TO TRAVELLER.—Plaintiff was injured while attempting to drive over defendant's tracks at a public crossing. Held, under the evidence the jury was warranted in finding that the defendant was guilty of negligence in not repairing the crossing, and that the plaintiff was free from contributory negligence.

3. RAILROADS—PUBLIC CROSSINGS—DUTY TO MAINTAIN.—It is the duty of a railroad company to use ordinary care to keep public crossings over its tracks in a reasonably safe condition for persons traveling over them.

4. DAMAGES—PERSONAL INJURIES—PERMANENCY.—In an action for damages growing out of personal injuries, the evidence held sufficient to warrant the submission to the jury of the issue of the of the permanency of plaintiff's injuries, and that a verdict of $5,000 damages was not excessive.

Appeal from Lawrence Circuit Court, Eastern District; R. E. Jeffery, Judge; affirmed.

#### STATEMENT BY THE COURT.

J. H. Smith sued the St. Louis, Iron Mountain & Southern Railway Company to recover damages for injuries alleged to have been sustained by him while driving over its railroad at a public crossing. He alleges that his injuries were caused by the negligence of the defendant in maintaining the crossing. The facts are as follows:

Near plaintiff's home in Independence County, there is a public road which crosses the defendant's line of railroad. The public road does not run straight across the railroad, but approaches it at a sharp angle, so that in driving across from north to south, the right wheel of a vehicle will go over the rail before the left one gets to it. During the first part of April, 1914, Smith, in a two-horse

wagon loaded with five or six hundred pounds of rock, drove upon this crossing from the north side. When his wagon wheels passed over the south rail, the wheels, on account of the defective condition of the crossing, dropped into a rut and plaintiff was thrown against the front end of his wagon, the lower part of his abdomen striking the dashboard of the wagon with great force. Smith made an effort to rise, and just as he got up, the rear wheels of the wagon fell into the rut, and he fell backwards, striking his back with great violence against the load of rock in the wagon. He said there were no crossing planks on the inside of the rails, and that the ties there were exposed; that the planks on the outside of the rail, on the south side of the crossing, had been raised up to the level of the top of the rail by the dirt which had been worked under it by vehicles passing over the crossing; that just beyond the planks, or about two feet from the rail, there was a drop of twelve or fourteen inches; that vehicles crossing the railroad had a tendency to pull the dirt out of place and work it up under the plank next to the rail, and in this way had created the rut; and that he drove on the crossing without any knowledge of its defective condition and was driving in the place usually traveled by wagons crossing there.

Other witnesses for the plaintiff stated that they had gone over this crossing about the time plaintiff was injured, and that there were no planks on the inside of the rail, and very little dirt, and that the ties were exposed between the rails. One of the witnesses said that he took a level about two and a half feet long, and measured it from the rail on the south side of the crossing two and a half feet, and that from there was a sheer drop of eleven and one-half inches. He said that he had had experience in constructing railroad crossings, and that one should be constructed with planks on both the inside and the outside of the rails, and that the space between the rails, if planks were not used, should be filled with stone and dirt; that where the crossing is slanting, as was the case here, the planks should slant with the crossing, and that the

fill of dirt should come up level with the top of the planks, and make a shoulder extending out a foot and a half or two feet which should slope down. He said the crossing in question was not constructed in this manner, and that the hole on the south side had been caused by wagons passing over the crossing and pulling dirt away.

Other witnesses testified that there was a drop of twelve to fourteen inches, or more, at the place where the plaintiff said he was injured.

The defendant company adduced testimony tending to show that the crossing was constructed in a safe and proper manner, and that it was not defective at the time plaintiff was injured. Other witnesses introduced by the defendant testified that after the accident, the plaintiff told them that he had been injured at a bad place in the public road some distance away from the crossing, and not upon the right-of-way of the railroad company. The plaintiff, however, denied that he had made these statements to the witnesses. Other testimony will be referred to in the opinion.

There was a verdict for the plaintiff, and from the judgment rendered, the defendant has appealed.

*E. B. Kinsworthy, Troy Pace* and *T. D. Crawford,* for appellant.

1. Instruction 1, given by the court, is erroneous. From it the jury might understand that if the crossing was in a defective condition, and plaintiff was injured by reason of such condition without negligence on his part, defendant is liable. In effect, it makes the railroad company an insurer of travelers against injury by reason of the defective condition of crossings.

2. The court's eighth instruction upon the measure of damages authorized the jury to consider, among other elements of damages, whether, "as a result of the injuries, the plaintiff has to any extent been permanently injured." Aside from Doctor Stevens, no other medical witness testified that the injuries were permanent, and he had not had opportunity to make such an examination as

would justify him in asserting that plaintiff's injuries would be permanent. 106 Ark. 186.

3. The verdict is excessive. There is no proof that appellee's injuries are permanent, and the difference between his earning capacity before the injury and after, is not so great as to justify a verdict for the large amount awarded.

4. The court ought to have directed a verdict for the defendant. The testimony does not establish that the alleged defective condition of the crossing had existed for such a length of time that the defendant could have had its attention called to it, and it does not appear that defendant had any notice of such defective condition. 28 Cyc. 1384, and cases cited in note 99; 20 L. R. A. (N. S.) 689, and cases cited.

*H. L. Ponder* and *Ira J. Mack,* for appellee.

1. Instructions are to be considered as a whole. When that is done in this case, it becomes apparent that instruction 1 is not open to the objection made by appellant. 100 Ark. 107, 119; 109 Ark. 231, 240; *Id.* 575; Thompson on Trials (2 ed.), § 2407.

2. There was testimony on which to base the court's instruction with reference to permanent injury, and it will be noted that under the instruction it was necessary for the jury to find from the evidence that there was permanent injury before they could consider that as an element in the award of damages. 13 Cyc. 144; *Id.* 217. If there was any error in the instruction, it should have been pointed out by specific objection. 97 Ark. 358; 65 Ark. 255; 109 Ark. 31; 100 Ark. 283; 101 Ark. 316; 102 Ark. 316.

3. The verdict is not excessive. The jury, under the testimony would have been warranted in returning a much larger verdict.

HART, J., (after stating the facts). (1) It is strongly insisted by counsel for the defendant company that the evidence was not sufficient to warrant the verdict. The law applicable to cases of this kind is clearly stated in the Am. & Eng. Enc. of Law (2 ed.), volume 8, p. 363, as follows: "It is the duty of every railroad company

properly to construct and maintain crossings over all public highways on the line of its road in such manner that the same shall be safe and convenient to travelers, so far as it can do so without interfering with the safe operation of the road.''

On the same page the author states: ''The duty of the railroad to construct and maintain crossings over public highways is a matter usually regulated by statutory enactment. And a failure to regard such statutory requirements will render the railroad company liable for all injuries from such neglect of duty.'' See, also, Acts of Arkansas, 1905, page 116.

On page 366 of the volume of the Encyclopedia of Law, above cited, the author said: ''An embankment constructed as a necessary approach to a railroad track is in legal contemplation a part of the crossing, and should comply with the provisions regulating crossings in general.''

Again, at page 374, it is said: ''The duty of the railroad company to repair and restore a highway is a continuing one, and commensurate with the increasing necessity of the public, and so, where the enlargement of a city or increased travel upon streets has rendered the crossing as originally restored inconvenient or dangerous, it is the duty of the company to adapt it to the public needs.''

To the same effect, see *Whitby* v. *Baltimore, C. & A. Ry. Co.* (Md.), 54 Atl. 674; Elliott on Railroads, volume 3, § § 1115, 1176.

Under the principles of law above announced, which are in accord with the decisions of the courts of last resort of most of the States, we think there was sufficient evidence to warrant the verdict. Of course, the testimony of the defendant tended to show that the crossing was properly constructed, and that it was not defective, but the testimony introduced by the plaintiff was in direct conflict with the testimony of the defendant. According to the testimony of the plaintiff's witnesses, the crossing was in a defective condition. They stated that there were no inside planks to the crossing, and that the ties were exposed

to view by reason of no dirt or stone having been placed there to bring the crossing up to a proper level. They said that on the south side of the crossing, the plank which had been put on the outside of the rail had come up to the top of the rail by reason of dirt having worked under it, and that one of the ends of this plank was not nailed down. They further said that a little beyond the plank, or about two feet from the rail, there was a sheer drop variously estimated by the witnesses from ten to fourteen inches. The plaintiff testified that he did not know of this defective condition of the crossing, and that when his front wheels fell into the depression, he was thrown from the spring seat in the wagon with great violence against the dashboard, and that when he raised himself, the rear wheels of the wagon fell into the depression, and he was thrown back on to the rocks with which his wagon was loaded.

(2)   If the condition of the crossing was as described by the plaintiff and his witnesses, the jury was warranted in finding that the defective condition of the crossing had existed for such a length of time that the defendant was aware of it. Besides, one of the witnesses for the plaintiff testified that he had been crossing there twice a week for several weeks about that time, and that the defective condition of the crossing existed for some time prior to the accident. Under these circumstances, the jury was warranted in finding that the defendant was guilty of negligence, and that the plaintiff was free from contributory negligence.

It is next insisted by counsel for the defendant that the court erred in giving instruction numbered 1, which is as follows:

"If you find from the evidence that the plaintiff was injured while attempting to pass with his wagon at a public crossing placed by defendant over its railway, and that the crossing was in a defective condition at the time by reason of the negligence of the defendant, and that the injury to plaintiff, if any, was caused by such defective crossing, and that the plaintiff exercised ordinary care

and prudence in attempting to cross over the crossing, then you will find for the plaintiff.''

(3)   No specific objection was made to this instruction. It was the duty of the railroad company to use ordinary care to keep the crossing in a reasonably safe condition for persons traveling over it, and it is the contention of counsel for the defendant that the instruction under consideration ignored this rule of law.   The instruction is not aptly drawn, but we do not think it is open to the objection now made to it.   When the court used the language ''that the crossing was in a defective condition at the time by reason of the negligence of the defendant,'' it evidently meant that the negligence of the defendant consisted in failing to use ordinary care to keep the crossing in a reasonably safe condition for travel.   In instructions given at the request of the defendant, the court told the jury that the railroad company does not insure the safety of persons crossing over its tracks at a public crossing, but the law only required it to use ordinary care to keep the crossing on the public highway over its tracks in a reasonably safe condition for travelers having occasion to use it.   If counsel for the defendant thought the instruction susceptible to the meaning now contended for, they should have made a specific objection to it, and, no doubt, the court would have changed the language used in it to meet the objections.   Not having done so, they are not in an attitude to complain.   The instructions given at the request of the defendant are not contradictory to the instruction complained of, but are explanatory of it. Therefore, we do not think the court erred in giving the instruction complained of.

It is also contended by counsel for the defendant that there is no testimony to warrant the finding of the jury that the plaintiff was permanently injured, and that on this account, the court erred in instructing the jury on permanent injuries.   We do not agree with them in this contention.   The plaintiff was injured on the 9th day of April, 1914, and the trial of the case was had on the 13th day of October, 1914.   At the time the plaintiff was in-

jured he was fifty-five years old, and never had any serious sickness.  He then weighed about 140 pounds, and his weight at the time of the trial was 122 pounds.  He was ruptured and severely injured in his back.  Plaintiff stated that since the accident, any noise or excitement bothers him, and that he is not able to sleep well; that before the accident he was able to do a great deal of both mental and physical labor; that he had been foreman of a construction gang, and that since his injury, it is difficult for him to read or to make figures; that he seems to see two objects; that his back still hurts him; that he has frequent headaches; and that he has suffered continuously with his back since the injury occurred.

A physician who examined him testified that he had a double inguinal hernia, and that from the history of the case, he was of the opinion that it was caused by the injury; that the hernia is a permanent injury unless the plaintiff has an operation performed, some of which are successful, and some of which are not; that in the great majority of cases an operation is successful, and the patient is practically well of the rupture in six months if he takes care of himself and avoids any heavy lifting or strains, which would have a tendency to bring it back.

The physician also stated, with reference to his injury in the back, the following: "His back injury, based on the number of cases I have seen, treated and observed, and from what I have read on the subject, it is my experience, if a man hurts his back badly once, he complains with it the rest of his life, when he does hard work, or there is a change in the weather.  While he might get better under proper treatment, still he may suffer the rest of his life.  As to the neurasthenic condition he has, the nervous trouble, I do not think any one ever dies from that.  It is a functional trouble, and the majority of them get well under proper care and treatment.  Sometimes a recovery takes place in six months.  Some recover in a few months, some in six months and others it takes years.  There is no way of telling how long it would take in any individual case.  Each case is a case

of itself. Some cases, if treated properly, will get well rapidly, while in some cases the patient will linger for months, and some never get well.''

The physician stated that the plaintiff was suffering from traumatic neurasthenia and nervous condition caused by the shock or fright.

(4) Evidence adduced by the defendant tended to show that the injuries of the plaintiff were not permanent but the jury were the judges of the weight of the evidence and the credibility to be given to the witnesses; and we think the testimony adduced by the plaintiff was sufficient to warrant the court in giving the instruction on permanent injuries. The physician specifically stated that, in his opinion, the injury to his back was permanent and that his rupture was permanent unless he was operated upon, and that an operation was not successful in all cases.

Finally it is insisted by counsel for the defendant that the damages awarded by the jury were excessive. The jury returned a verdict for the plaintiff for $5,000. Under the facts and circumstances adduced in evidence we can not say that that amount was excessive. The physician who testified in favor of the plaintiff said that an operation for hernia would cost from two hundred and fifty to five hundred dollars and that one couldn't do much work for six months thereafter; that, as to his neurasthenic condition, he might get well in about six months, or it might take years, and that some never get well; that the probable expense of treatment for his nervous trouble would be from $25 to $50 a week, depending upon the place he went to for treatment; that it was necessary for him to have complete rest to cure his trouble; that the older a person is the worse the trouble is and the longer it will take for the patient to recover; that the plaintiff's headache, backache and eye trouble are all symptoms of his nervous troubles; that he should be taken to a sanitarium and should stay there at least six months, and that it might require years to cure him.

The plaintiff testified that he has not been able to do any work since the injury and that he was capable of earning, as foreman of a construction gang, an occupation which he was well qualified to fill, the sum of $100 per month; that he was a farmer and owned a farm, and that his services as manager of the farm were worth $50 per month. Taking into consideration the time lost between the date of the injury and the time of the trial, and six months, the least possible time within which the physician gave him to recover, it would require at least $600 to compensate him for his services. The jury might have found that it would cost him $2,000 for a surgical operation and expenses at the sanitarium, even if he should be cured. This would leave him less than $2,500 for his pain and suffering which he had endured and was likely to endure in the future and for permanent injuries which the jury might have found under the testimony he had received. Under these circumstances it can not be said that the verdict was excessive.

We have carefully examined the record and find no prejudicial error in it. Therefore the judgment will be affirmed.