MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE
*v.* WRIGHT.

4-5404                                    126 S. W. 2d 609

Opinion delivered March 6, 1939.

*T. B. Pryor* and *Daggett & Daggett,* for appellant.

*Marvin Watkins* and *Richardson & Richardson,* for appellee.

HOLT, J. Appellee, Otto Wright, sued appellant in the Poinsett circuit court for damages to himself and his automobile growing out of an accident alleged to have been caused by the defective and unsafe condition of the crossing where appellant's switch track crosses the concrete highway in the town of Hoxie, Arkansas. The allegations of negligence set forth in appellee's complaint are that on and prior to November 8, 1937, appellant was negligent in maintaining the crossing in question in that: ''The cross-ties supporting the rails were in a decayed condition, had sunk deeper into the ground, and the spikes holding the rails had given way because of the decayed condition of said ties; the concrete or asphalt covering the ends of the ties on each side of the track had risen above the level of the highway so as to form prominent humps on each side of the track bordering each rail of the track on the outside thereof; the rails of the track, and those placed between them, had sunk several inches below the level of the highway; that by reason of the prominent humps, as aforesaid, and the sunken condition of the rails and ties, as aforesaid, and the angle of intersecting said highway, as aforesaid, said crossing was defective, dangerous, and unsafe to the public in passing over it in the usual travel, all of which was known to defendant and the employees engaged by defendant whose duty it was to properly maintain said crossing, and defendant was negligent in maintaining said crossing in the manner aforesaid; that in the forenoon of November 8, 1937, plaintiff was driving his auto-

mobile northward from Hoxie to Walnut Ridge upon the east side of said highway at a reasonable rate of speed of about forty to forty-five miles per hour, and while he was doing so and while he was exercising ordinary care for his safety, he drove his car over said crossing, and, in passing over the crossing and because of its defective, dangerous and unsafe condition, as aforesaid, his car was suddenly and violently jerked, snatched, and bounced thereby causing the steering rod controlling the right front wheel and the rod which runs from one front wheel to the other to hold them in line to be sprung, thereby causing said car to leave the road and bear to the right and run across a ditch, strike a post and turn over, thereby demolishing plaintiff's car and inflicting injuries to his person, all of which was caused by the negligence of the defendant in maintaining said crossing in the defective, dangerous and unsafe manner, as aforesaid." He prayed for damages to his car in the sum of $300 and to himself in the sum of $2,700. Appellant answered denying each and every allegation of the complaint, and in addition set up the affirmative defense of the contributory negligence of appellee as a complete bar to a recovery. The case was submitted to a jury and a judgment was returned for appellee and against appellant in the sum of $2,200.

The facts, as reflected by this record, stated in their most favorable light to appellee, substantially are: It is conceded by the parties that 1,000 cars passed the crossing daily where the accident occurred. Appellee Wright has been a resident of Hoxie for about twenty-five years and on November 8, 1937, was a member of the town council of Hoxie. At the time of the accident he owned and was driving a 1935 model V8 Ford tudor sedan. The car was in good condition. It was raining slowly at the time of the accident; and appellee was driving north along concrete highway No. 67 from Hoxie toward Walnut Ridge. The concrete slab is 18 feet wide. The railroad track intersects this highway at an angle of about forty-five degrees and it was this crossing that he was negotiating at the time of the accident. Before he

arrived at the crossing he was driving between forty-five and fifty miles per hour and when within about 100 yards of it he released the accelerator, coasted onto and over the crossing at a speed of about forty-five miles per hour and when the car struck the crossing it bounced up as if it had struck a log and shifted to the right.

Appellee's version of what happened, in his own words, is as follows: "It got off the pavement. It began to scoot and I tried to straighten it up and back to the left on the pavement, and I found I couldn't do nothing with the car so I tried to stop it. I thought I was at least, but since the accident and I got my wits together I found that I had the accelerator in place of the brake, and when the car left the highway it had rained enough to make the surface of the ground and the grass slick, and by that time I had got hold of the brake and that caused the car to skid, and I was pretty well excited—all those telephone poles and everything there. And all I remember the car turning over was one time and a half and it stopped on the railroad upside down." The accident happened at about 9:30 a. m. Appellee had crossed this crossing at the same rate of speed many times before without accident.

On a day in the week following the accident he observed the condition of the crossing and saw high and low spots in the asphalt covering the ends of the cross-ties on each side between the pavement and the rails and there were other rails between the two rails of the railroad tracks running lengthwise with them, some low and some high. There were humps in the asphalt higher than the pavement. He had never made an examination of the crossing before and was unaware of its condition. After he had crossed the crossing and had gone about ten or twenty feet he observed something was wrong with his car and had gone about fifty feet before his car left the pavement. After the wreck he found the radius rods to his car bent to a v-shape and his right wheel turned out to the right. Had noticed some vibration to the car in crossing over this crossing before.

The incorporated limits of Walnut Ridge and Hoxie join, Walnut Ridge being the larger of the two. A great many automobiles from out of the state, including large trucks, cross this crossing and continued to do so after the wreck. His car turned over one and one-half times and landed on the west main line of the railroad track. He has been driving a car for a good many years and is thirty-one years of age, does not have the reputation of being a dangerous driver. Considers a speed of fifty to sixty miles per hour fast.

Tom Norris, on behalf of appellee, testified that he saw appellee's car as it went over the crossing going north. It seemed that he lost control of it and after it left the highway it turned over one and one-half times. He thought to himself the crossing was rough but did not look rough. You don't have to drive over the crossing fast to cause your car to shimmy. He had been familiar with the crossing ever since it was put in. Appellee's car was going about forty miles per hour. There is a highway sign in Hoxie fixing the speed limit at twenty-five miles per hour and there is a city ordinance to this effect.

W. C. Cloyd, marshal of Hoxie, testified the asphalt ridges were about four inches higher than the rails; steel rails were laid between the main line rails, some of which reached entirely across the highway, some were in pieces, they were not all uniform in height. People drove on this highway No. 67 as fast as sixty miles per hour. To his knowledge no arrests for speeding on this highway have ever been made. Appellee is considered a careful driver. A seed truck about a year before the accident had turned over at this spur crossing, but he does not know just what caused it. If you could drive over the crossing straight it would not be so rough, but it is angling and causes the car to twist.

R. D. Moore testified that he had been acquainted with the crossing for about seven years and it is worse than it used to be. The average speed over it is between forty and fifty miles per hour. On November 8, 1937, its condition was such that in passing over it a car would be

drawn to the side and this condition was worse going toward Walnut Ridge. He drove over this crossing every day for two or three weeks before the accident, sometimes making forty miles per hour, but never had a wreck.

Oswell Sullens testified that the crossing in question is rougher than other crossings. He usually drives between forty and sixty miles per hour in going over the crossing. The effect of going over the crossing is to cause the front end of a car going toward Walnut Ridge to jump; the crossing had been in that condition for quite a while before the wreck. Since the accident he has lowered his speed in going over this crossing. Never had a wreck at this crossing.

Dink Williams testified for appellee that he had several years experience as a civil engineer and made a plat of the crossing in question. He estimated the angle at which the spur track intersects the highway to be about thirty degrees. Plat was made on February 3, 1938, and the crossing appeared to be in the same condition then as it was on November 8, previously; there was no evidence or indication of anything new or changed about it. He had been acquainted with this crossing for several years. "On the south side of the crossing it seemed that the water or something had caused the asphalt to raise up there about the railings at that end in there. The south side was about, as I remember, about two and a half inches higher than the main rail that the train crosses over. There are several other railings in there used to raise the elevation between. The north side is about three inches higher than the main rail." The railings between the railroad rails were one to three inches out of line; off the level. The asphalt on the south side adjacent to the south rail was about six inches wide and that north of the north rail was about twelve inches wide. The rails which were laid between the railroad rails were from one to three inches off level; their distance apart were varied; they were not uniformly spaced. There is asphalt set between these rails, and some places are higher than others. Spent about forty-five minutes making the

measurements on February 3, 1938, and several cars passed during that time, none having accidents, and they crossed at the usual speed.

Jess Maness testified that he has been a mechanic for fifteen years, is acquainted with the crossing. In driving north over it the left front wheel reaches the crossing first and it jerks the wheels. He tested his cars over this crossing because it would reveal any vibration in the front end of cars more than any other place; this is due to the roughness of the crossing and the way it is set in the highway. He has driven over this crossing testing cars at various speeds up to sixty miles per hour; had crossed it many times up to ninety days before the trial; has never had an accident there, but does not cross fast in his own car for fear of damaging it. Anyone who drove over the crossing often should know where the humps were. The humps are on each side near the edges of the highway, between each lane of traffic, and in the middle of each lane. A car traveling forty or forty-five miles per hour and striking one of the humps on the crossing would have a tendency to bend the tie rod as it was bent on this car.

Tom Palmer, an automobile mechanic for fifteen years, testified that the crossing was rough on November 8, 1937, and taking in consideration the angle at which it intersected the highway and the humps, and if you hit it just right, it would throw you, and that would produce the condition that the car was in after the wreck. He does not think driving the car into the ditch sixteen inches or two feet deep with the ground soft and muddy would cause that condition of the car; that condition might be caused by running over a railroad track. In driving forty or forty-five miles per hour over the crossing he always picked the place to go. The right front wheel of the car went into the ditch first at such an angle that the pressure on it would have a tendency to bind it in to the front instead of outward to the front.

On behalf of appellant, A. F. Bradford testified that he is a civil engineer employed by appellant, is acquainted with the crossing in question and on February

21, 1938, made a plat of it. The crossing was constructed in conformity with Act of February 25, 1913, Acts 1913, p. 328, and was in that condition on the date of the accident. From the crossing to the whistling post, where the wrecked car finally stopped, is a distance of 325 feet. The grade in the highway from a hundred feet on each side of the crossing has a three-inch rise. The space between the rails is filled in with other rails, some broken, and with asphalt. There is not much variation in their heighth and distance apart, the greatest variation from all four corners being about two inches. The angle at which the crossing intersects the highway has nothing to do with its roughness and does not know of any repairs in the crossing since its construction. Pictures of this crossing were introduced in evidence. They were made on a day when the pavement was dry.

Charlie Prentiss testified for appellants he had lived in Hoxie twelve years facing this highway and he counted the cars passing his house one day and there were more than one per minute. Appellee has the reputation of being a fast driver. He has seen others drive as fast as Wright did on this highway. Can't say that the crossing is smooth and has observed cars shake as they went over it.

Willie Rackley testified that he rode with appellee from Hoxie post office to Red Star Service Station in Hoxie (two blocks) and felt unsafe and got out because of fast driving. Saw the Wright car as it hit the crossing and it appeared to be traveling faster than forty or forty-five miles per hour. Appellee's car left the pavement at the street intersection just north of the crossing, the wheels turned to the right and it left the pavement, cut across the ditch toward the railroad track, turned over when it hit the ditch and struck a whistling post and bounced over onto the railroad track bottom side up.

Fred Frew, for appellant, testified that when appellee's car hit the crossing it looked like the back end bounced up about eighteen inches high; could not see the front end; it seemed that appellee missed the highway beyond the crossing and hit the street intersection and turned over a couple of times.

Troy Pace testified that he had lived in Hoxie forty-two years and worked for the express company and drives a taxi; crossed this crossing often at forty miles per hour and it is not dangerous. He is familiar with the humps at the crossing and if you struck them it would cause your car to bounce, otherwise there would be only a vibration. Some folks travel over it faster than he does; he was never thrown off the pavement there.

Appellant earnestly contends here that giving to the testimony of appellee its strongest probative value it falls far short of that substantial character necessary to support a verdict in his favor. Appellant also insists that the trial court erred in giving certain instructions after modifying same. After a careful consideration of the entire record, we have reached the conclusion that appellant's first contention, to the effect that the evidence is not sufficient to support a verdict in appellee's favor, must be sustained. It, therefore, becomes unnecessary to consider the other questions raised by appellant.

Under the law it was the duty of appellant railroad company to exercise ordinary care, to keep and maintain the crossing in question in a reasonably safe condition for ordinary travel and this duty was a continuing one. The trial court in a proper instruction clearly stated this duty of appellant to the jury. The jury was also correctly instructed that any negligent act on the part of appellee, which caused or contributed to his injuries and consequent damage, would be a bar to recovery.

The practically undisputed facts, as reflected by this record, show that appellee, a man thirty-one years of age, twenty-five years a resident of Hoxie, one of its aldermen, entirely familiar with the crossing in question, at about 9:30 a. m. on November 8, 1937, while a steady rain was falling, drove his Ford V8 sedan automobile at an admitted rate of speed of approximately forty-five miles per hour north on concrete highway No. 67 from Hoxie toward Walnut Ridge over the crossing in question, his car at the time being in excellent condition, that as he struck the crossing his car bounced and

some twenty feet after passing over said crossing something seemed to pull his car to the right, he became excited, stepped on the accelerator instead of the brake and at a point about fifty feet from the crossing left the highway, went into a muddy ditch, turned over one and one-half times, ran into a whistling post and finally stopped with his car bottom side up on the railroad track 327 feet from the crossing.

From the photographs in evidence and the testimony of engineers, this crossing was constructed in compliance with the state law and at the time of the accident the depressions in it would not vary more than two to four inches. It is conceded that at least 1,000 cars a day, of all sizes and makes and at speeds up to sixty-five miles per hour, including trucks, passed over this crossing, and that from the date this crossing was constructed in 1926 not a single accident before this one had ever been recorded, except that a truck about a year before turned over at or near this crossing, but the cause of the mishap is not shown. It seems to us that there could be no better proof of the fact that appellant did use that degree of care required of it to keep and maintain this crossing in a reasonably safe condition for the ordinary use of the traveling public than that hundreds of thousands of cars negotiated this crossing safely, at all speeds, up to sixty-five miles per hour, up to the very time the accident in the instant case occurred, and the further fact that appellee's witness, Dink Williams, an engineer, made an examination of the crossing on February 3, 1938, eighty-seven days after the accident, and testified that at that time, to use his own words, "It didn't look like anything new had been done to it previously. There was no sign of any work that had been done on the crossing before." On this date, eighty-seven days subsequent to the accident, it is admitted that at least 87,000 cars had passed over this crossing in absolute safety and without complaint from anyone. Also there is no evidence that any complaint was ever made to the Hoxie municipal officials that this crossing was in a bad condition. We think that

under the evidence in this case appellee's own negligence was the proximate cause of the accident and the injuries resulting therefrom. Unless we are going to hold that the appellant is an insurer there can be no recovery in this case.

In *St. Louis & San Francisco Railroad Company* v. *Dyer*, 87 Ark. 531, 113 S. W. 49, this court states the duty resting upon a railroad company in cases of this character as follows: "The law requires the railroad to use ordinary care to keep the crossing of the public highway over its tracks in a reasonably safe condition for travel and crossing."

And again in *St. Louis, I. M. & S. Ry. Co.* v. *Smith*, 118 Ark. 72, 175 S. W. 415, the rule is stated in this language: "It is the duty of every railroad company properly to construct and maintain crossings over all public highways on the line of its road in such a manner that the same shall be safe and convenient to travelers."

In *Missouri Pacific Railroad Company* v. *Hare*, 194 Ark. 441, 108 S. W. 2d 577, this court reiterated that the duty of the railroad company was that as set forth in the Dyer and Smith cases, *supra*. The rule followed by this court is very clearly stated in an Iowa case, that of *Gable* v. *Kreige*, 221 Ia. 852, 267 N. W. 86, 105 L. R. A. 546, as follows: "The company owes only the duty to keep the highway in a reasonably safe condition; to put in as safe condition as highways usually are kept for travel. It is not bound to make the highway more safe than highways usually and ordinarily are made and kept for travel. From our common observation we all know that in nearly every mile of the highways of the country there are to be found depressions or ridges, or other inequalities of surface, which do not interfere with the safe use of the highway when traveled over in the usual and ordinary method, but which are sufficient to jolt vehicles passing over them. The severity of the jolt would depend, of course, largely upon the speed at which the vehicle is moving at the time it passes over. There is no duty resting upon a railway company to keep the surface of the road, at the crossing, so smooth and free from all inequalities that no

jar or jolt will be caused by vehicles passing over the crossing."

In another Iowa case, *Harris* v. *Chicago, M., St. & St. P. Railway Co.*, 278 N. W. 338, the court held: "While the court will take judicial notice of the difference in the usual means of transportation of the horse and buggy days and the present high speed automobiles, there is no duty to maintain a roadway more safe than roadways usually are; it is commonly known that roadways generally contain depressions and ridges sufficient to cause jolts to vehicles passing over them, the severity of the jolt depending upon the speed of the vehicle, and the burden rests on the plaintiff to show that the crossing is not suitable for the present conditions."

Again in *Myers* v. *Chicago, M. & St. Paul Ry. Co.*, 101 Fed. 915, the court said: "As already said, this inequality in the surface of the crossing had existed for years, and its position was such that it must be passed over by every vehicle that was driven over the crossing. It was not shown that it had ever caused, or aided in causing, an accident other than the one in which plaintiff was injured. By itself, it was not a self-operating or efficient cause of the accident."

Under the facts in this case we think it just as probable that the manner in which appellee was driving his car at the time of the accident was the proximate cause of the wreck and consequent damages as that a defect in the crossing might have been the cause. Juries may not base verdicts on speculation or conjecture. This court in the recent case of *Marathon Oil Company* v. *Sowell*, 191 Ark. 865, 88 S. W. 2d 82, said: "If presumptions are to be indulged in, and they are not, it is just as reasonable to presume that the method and manner of driving the truck was the cause of the accident as it is to presume that the defective condition of the truck caused it. It might have been caused by the speed of the truck in the loose gravel. It might have been caused by the negligence of the driver in failing to watch the road and to observe the curve which he was approaching on a down grade. It might have been caused

by any number of reasons as well as the defective condition of the truck. The law, however, does not permit verdicts and judgments to rest upon speculation and conjecture. *National Life & Accident Insurance Co.* v. *Hampton,* 189 Ark. 377, 72 S. W. 2d 543. It is the general rule in this state that in an action for personal injuries caused by the negligent conduct of another, no recovery can be had, in the absence of evidence showing it to have been the proximate cause of the injuries complained of. As stated by Judge HART in *Mays* v. *Ritchie Grocery Co.,* 177 Ark. 35, 5 S. W. 2d 728: 'It is also a general rule in this state that, in order to warrant a finding of negligence was the proximate cause of an injury, it must appear that the injury was the actual and probable consequence of the negligence and that it ought to have been foreseen in the light of attending circumstances.' "

We conclude, therefore, that the trial court erred in refusing to instruct a verdict in favor of appellant at the conclusion of the testimony, and since the case seems to have been fully developed it will be reversed and dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.