MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE, v. HOWELL.

4-5580.                                         132 S. W. 2d 176

Opinion delivered October 16, 1939.

Thomas B. Pryor and Daggett & Daggett, for appellant.

Walter N. Killough, for appellee.

MEHAFFY, J. On October 21, 1938, the appellees, D. M. Howell and the American Insurance Company filed complaint against the appellants, Missouri Pacific Railroad Company and Guy A. Thompson, trustee, alleging

that on December 20, 1937, about 8:30 o'clock p. m., at a point between Cherry Valley and Vandale, Cross county, one of the railroad company's passenger trains ran into and destroyed a 1935 model Ford pick-up truck of the value of $425. It was alleged that the operators of the train failed to exercise proper and ordinary care in the operation of same, were operating it at an excessive rate of speed, failed to give warning of the approach of the train and failed to give the crossing signal as required by statute. In addition thereto, it was alleged that the grade crossing upon which the accident occurred was not properly kept and maintained, in that the rails were from four to five inches above the ground, which caused the truck to stall; that Howell was insured against damage to the truck in the amount of $250, which amount was paid to him by the insurance company, and that the insurance company was subrogated to the right of Howell to the extent of $250.

On November 17, 1938, answer was filed denying each and every allegation of the complaint.

The evidence showed that the crossing mentioned in appellees' complaint was a public road crossing used by the public generally.

Lonnie Smith testified that he had been using the crossing prior to the accident, hauling cotton over it for two years; it was a bumpy crossing, and the rails were up 3½ to 4 inches from the surface between the rails; some repairs had been recently made to the crossing; he hauled his crop across this crossing to the gin; the road was used a good deal by other people with wagons, trucks and automobiles. Witness had never seen any vehicles stalled upon it.

Leonard White testified that he lived a quarter of a mile from the crossing. The train stopped about his house after the accident; the rails were sticking up above the surface of the crossing at the time of the accident, probably as much as four inches. Witness used the crossing considerably and could get over it, and it did not bother him at all.

Mrs. Lonnie Smith testified that she heard the train coming before it reached the crossing; if it whistled she did not hear it; it whistled just before the crash; that was the only time she heard it; does not know how far the train went after the crash.

The appellee testified that he used this particular road probably twice or three times a month prior to the accident. On the night of the accident it was muddy and raining, and he was hunting the driest way to get home; it was cloudy and drizzling rain and fog; did not know the time the passenger train was due; the crossing is elevated some eight feet above the surface of the road; he was approaching the crossing from the west; there are some woods along the right-of-way about a quarter of a mile north of the crossing, and it would not have been possible for witness to have seen this train north of the crossing a mile or half mile away without coming up to the rails or upon the dump; the woods prevented his seeing the train half a mile or a mile away; the dump is 15 or 20 feet long on the west side of the crossing; he looked both north and south for a train as he approached, but did not see it; had not told the claim agent or anybody else that he saw the train a quarter or half mile away; he came up on the crossing and when his truck bumped over on the rail sticking up it stopped; the train was coming so he jumped out of the truck; when he got up to the track and saw the train he had just enough time to get out of the truck, that was all; he slowed up to get over the rails and killed his motor; the motor was in good condition, but it cut out crossing the rough tracks; just had time to get out of the car and run; when the truck was struck, he was not very far away, and he was still running; he did everything he could to see if a train was approaching; there was a heavy fog, and one could not see a light very far; when he first saw the train it was close to him, and he just barely had time to get out of his truck. There is a quarter of a mile of clear space between the crossing and the woods north of the crossing; it was this woods, a quarter of a mile away, that kept him from seeing the train; he looked for the train when

he was at the foot of the dump about 15 feet from the crossing; the train ran in excess of a quarter of a mile while he was traveling 15 feet.

A statement was introduced that witness said he did not read. It stated that he kept his car in second gear until it stalled on the crossing; that as he went over the rail he pushed in on the clutch, slowed up a little so his truck would not bounce so much, and when he pushed the clutch in the motor died; the front wheels of his truck stopped over the west rail; about the time the truck stopped he looked and saw the headlight of what he took to be a train; it appeared to be about a fourth of a mile north of the crossing; he jumped out and saw he could not move the truck, and then ran because he was afraid the train would knock the truck against him. He testified that that part of the statement, that he tried to push the truck back, was wrong, because he did not have time. It was correct about stating that he saw the train, but it was not a fourth of a mile away. Witness identifies the picture which is introduced in evidence. If his motor had not stalled, he would have gotten over the crossing before the train came.

Earl Dexter testified as to the value of the truck, but there is no contention made about the amount of the verdict.

The appellee was recalled and testified that he had owned cars and trucks since 1934; had been driving continuously, and had never had an accident before.

J. C. Ellison, a witness for appellants, testified that he had been roadmaster for the Missouri Pacific Railroad Company for 30 years and was familiar with the crossing; was riding on the train that was involved in the collision; heard the engineer blow the whistle for the crossing, and immediately after felt the emergency brake and knew something had happened; went back to the crossing after the train stopped; there was no injury to the road bed at the crossing, but the cattle guard south of the crossing was destroyed; crossing was made of composition asphalt and rock, and it was not necessary to make any repairs after the accident. Crossing was in good repair, not the

best, but in good repair. He has approximately 128 crossings in the 150 miles of track under his supervision; does not see all the crossings every week, but sees them at least once a month, traveling over them in a motor car; heavy rains can remove loose gravel from the rails and leave the rails sticking up; knows that the engineer whistled for the crossing; saw the crossing that night and next day, and it was in good condition for ordinary vehicular travel across it; the rails stuck up about a half an inch above the surface of the crossing.

J. O. Madison testified that he had been 26 years in the employ of the railroad company as fireman and engineer; was fireman on the train involved in the collision; was working a very powerful engine, about a 100-ton engine; they were going about 70 miles an hour as they approached the crossing; he first saw the truck when he was 800 to 1,000 feet away from it; the engineer applied the brakes in emergency, and the train ran about 2,300 feet from the time the brakes were applied until it stopped; there was nothing either he or the engineer could do to keep from hitting the truck; he saw the truck the first moment he could; he saw the truck about the time the engineer did and about the time he hallooed to the engineer the engineer applied the brakes; the headlight was in good condition.

J. E. Underwood testified that he had been in the service of the Missouri Pacific as engineer for 40 years; was driving the engine involved in the collision; was whistling for the crossing; after seeing the truck kept blowing as fast as he could to attract attention; was blowing when he first saw the truck.

The appellee, recalled in rebuttal, testified that sometime after the accident, he saw men working on the crossing; at the time of the accident the crossing was gravel, and it is now asphalt.

At the close of all the testimony the appellants requested the court to instruct the jury to return a verdict for appellants, which request was denied.

After the instructions had been given by the court, the jury rendered a verdict for appellee, D. M. Howell, in the sum of $155, and a verdict in favor of the insurance company in the sum of $245, and a judgment was entered upon the verdicts.

Motion for new trial was filed and overruled, and the case is here on appeal.

Appellants say that the appeal is predicated upon the following propositions:

"1. The testimony conclusively proves contributory negligence on the part of plaintiff, D. M. Howell, which should operate as a complete bar to the right of recovery of both plaintiffs.

"2. The testimony is insufficient to show failure on the part of defendant to exercise ordinary care to maintain the crossing in a reasonably safe condition for ordinary vehicular traffic.

"3. The testimony is conclusive that the crossing was, at the time of the collision, in a reasonably safe condition for ordinary vehicular traffic."

Appellants' first contention is that the evidence shows that appellee, Howell, was guilty of contributory negligence. We have set out the testimony above on the question of giving the statutory signals, and by reference to said testimony it will appear that the evidence was in conflict. It was, therefore, a question for the jury to determine, and they found against the appellants.

The court instructed the jury with reference to giving the statutory signals, and told them expressly that the operators of the train did not have to sound the bell and blow the whistle, but that the statute provides that one or the other shall be done. But it is earnestly contended by appellants that even if the jury should find that the statutory signals were not given, appellees could not recover, because plaintiff himself was guilty of contributory negligence.

Contributory negligence is negligence on the part of the plaintiff that contributes to the damage, and if the

negligence of plaintiff contributes in any degree to cause the damage, he cannot recover.

The appellee, Howell, testified that it was cloudy and drizzling rain; that the crossing is elevated eight feet above the surface of the road. He was approaching the crossing from the west, and that there are some woods along the right-of-way about a quarter of a mile north of the crossing; that it would not have been possible for him to have seen the train north of the crossing a half mile away without coming up close to the rails or up on the dump; that the woods prevented his seeing the train, although he looked both north and south; that he came up on the crossing and bumped over the rail sticking up; his engine stopped, and the train was close to him so he jumped out of his truck. When he got on the track and saw the train coming, he just barely had time to get out of the truck.

Mrs. Lonnie Smith testified that the train whistled immediately before the crash; that was the only whistle she heard.

Appellee did not know what time the train was due, and he had a right to assume that the railroad company would not be guilty of negligence in failing to give the signals required by statute. The question of contributory negligence was a question for the jury, and its verdict, if there is any substantial evidence to support it, will not be disturbed.

It is next contended that the testimony is insufficient to show failure on the part of appellants to exercise ordinary care to maintain the crossing in a reasonably safe condition for ordinary vehicular traffic.

Section 11057 of Pope's Digest makes it the duty of the railroad company to construct the crossings in such a way that the approaches to the roadbed on either side shall be made and kept at no greater elevation or depression than one perpendicular foot for every five feet of horizontal distance, such elevation or depression being caused by reason of the construction of said railroad.

In the case of *Payne* v. *Stockton,* 147 Ark. 598, 229 S. W. 44, this court said: "In construing this statute in *St. Louis, I. M. & S. Ry. Co.* v. *Smith,* 118 Ark. 72, 175 S. W. 415, the court held that it is the duty of every railroad company to properly construct and maintain crossings over all public highways on the line of its road in such manner that the same shall be safe and convenient to travelers, so far as it can do so without interfering with the safe operation of the road."

Appellants call attention to the case of *Missouri Pacific Railroad Co.* v. *Wright,* 197 Ark. 933, 126 S. W. 2d 609, and state that in that case the duty imposed upon the company was positively stated by the court as follows: "Under the law it was the duty of appellant railroad company to exercise ordinary care, to keep and maintain the crossing in question in a reasonably safe condition for ordinary travel, and this duty was a continuing one."

Appellants cite the case of *Gable* v. *Kriege,* 221 Ia. 852, 267 N. W. 86, 105 A. L. R. 539, and state that the rule followed by this court is very clearly stated in that case. The court in that case said: "The defective equipment of the truck, and its overloading and excessive speed, were without question the proximate cause of the accident involved in this case. The driver of the truck, as plaintiff's witness, testified that there were no brakes thereon; that there was a load of six or seven tons of gravel, and that the overload was at least three or four tons; that he approached the crossing at 12 or 15 miles an hour with a truck thus equipped and thus overloaded. It is certain that the left front wheel of the truck could never have gotten into the hole or depression on the west or right-hand side of the highway, and the evidence clearly shows that the left front spring and shackle were broken, not from the condition existing at the crossing, but wholly on account of the defective equipment of the truck, the partially broken left spring, the overload of gravel, and the speed at which the truck was being driven. And this must be held to be the primary cause of the resulting accident."

The facts stated in the case cited are wholly different from the facts in the instant case. The railroad

964

owed the duty to exercise ordinary care to maintain the crossing in safe condition. As to whether this duty was performed or not, the evidence is in conflict. There is, however, substantial evidence tending to show that this duty of the railroad company was not performed; that the crossing was not maintained in good condition. The question was properly submitted to the jury, and it found against the appellant's contention.

On questions of fact, the finding of the jury is conclusive. The jury is the judge of the credibility of witnesses and the weight to be given to their testimony.

This court has many times held that in testing the legal sufficiency of the evidence, we must view the testimony in the light most favorable to appellee. This court said: "In testing the question of the legal sufficiency of the evidence we must, under rules well settled by the decisions of this court, view the testimony in the light most favorable to appellee, and give it such force as the jury might have given it." *St. Louis-S. F. Ry. Co.* v. *Whitfield*, 155 Ark. 560, 245 S. W. 323.

It is not contended that the jury was not properly instructed, and it is, therefore, a question of fact, and the evidence being in conflict, the jury's verdict must be sustained.

The judgment is affirmed.