WILLIS T. UNTIEDT v. ST. LOUIS SOUTHWESTERN RAILWAY CO.

5-4893                                              440 S.W. 2d 251

Opinion Delivered May 12, 1969

*Terral, Rawlings, Matthews & Purtle* for appellant.

*Coleman, Gantt, Ramsay & Cox* for appellee.

CONLEY BYRD, Justice.    Appellant Willis T. Untiedt sued St. Louis Southwestern Railway Co. for the dam-

.ages.that.occurred to his tandem lowboy truck after it became trapped on the railroad tracks at the Highway 88 crossing in Altheimer. The trial court directed a verdict for the railroad. Untiedt for reversal claims that there was sufficient evidence to take the case to the jury on the failure to keep a lookout and the statutory duty of the railway company to maintain the approaches to its tracks at the crossing.

The appellee's tracks in the City of Altheimer run from southwest to northeast. Its trains are controlled by a dispatcher in Pine Bluff through the use of signal blocks. A train from Pine Bluff approaching Altheimer commences to blow its horn at the Cotton Center crossing described as being 15 pole lengths from the Highway 88 crossing. A pole length is 176 feet. The signal block controlling north bound trains is 10 pole lengths or 1760 feet southwest of the highway crossing. The highway over which Untiedt was routed with his permit load in the city of Altheimer paralled the railroad track, on the north side, from west to east commencing at Olive Street past Chestnut Street, Main Street and on to Edline Street. The railway depot is located between Main and Edline Streets on the north side of the railroad tracks between the highway and the tracks.

Untiedt and two other tractor lowboy rigs were hauling experimental cotton-picking machines from Santa Rosa, Texas, to the John Deere place in Altheimer. When they reached Altheimer, the three units were parked beside the highway near the depot while the lead driver sought information about their destination. The lead vehicle and Untiedt's vehicle parked between Main.Street and the Highway 88 crossing. The driver of the third vehicle parked parallel with the highway between Chestnut Street and Main Street, at the western edge of Main Street. The third truck remained at this position during the collision involved here. After the lead driver obtained his information, he pulled up and made a right turn across the Highway 88 crossing. The lead driver

had no difficulty crossing the tracks. When Untiedt pulled up to make his right turn across the tracks the lowboy he was pulling became stuck on a hump or hogsback or rise in the approach to the crossing, trapping Untiedt's truck on the tracks so that he could go neither forward or backward.

Untiedt testified that the first thing he did when he got out of his truck and saw what was wrong was to go around the truck and right over to the depot. He estimates that about 15 minutes elapsed from the time he became stuck until the collision. On direct examination he stated that he was in the depot from 5 to 10 minutes and on cross examination says that it could be anywhere from 2 to 6 minutes. He had left the depot and was standing outside when the train struck his truck. When asked, on direct, what Ralph Cratin, the driver of the number three truck was doing, Untiedt stated:

"A. Well, he went out on the track and went down the track to see if he knew what was wrong, he knew what was going on, he could see it and he went out on this track and down the track a short distance and waved his arms and tried to wave this help to get this train stopped.

"Q. In any event he was going down the track waving his arms?

"A. Right.

"Q. Now where was he with reference to this, was he on the Pine Bluff side of this building here or was he between the building and highway 88?

"A. No, he was down towards Pine Bluff just about a block, well, I don't know if it would be a block, it would be a long block from the crossing where I was to the next crossing towards Pine Bluff.

"Q. Towards which the train was coming. In any event, you say he would be on the Pine Bluff side of the depot?

"A. Right.

"Q. All right, now from the Pine Bluff side of this depot, Mr. Untiedt, and looking down towards Pine Bluff what distance down that way could you see a train coming?

"A. Well, you could see a train coming from where he was quite a distance down.

"Q. Now what would you classify as quite a distance?

"A. Well, I don't know, maybe a couple of miles, maybe two or three."

Untiedt says that the front of the train stopped within a 100 to 150 feet past the point of impact. On cross examination Untiedt testified:

"Q. Where was the second, actually the third truck driver, where was he located at that time?

"A. Approximately a block down the street by the next crossing, just say he was parked to enter the next crossing.

"Q. He hadn't started up to follow you?

"A. No. no, when I went around I headed, I went to the depot and at the same time evidently he went on the track because when I come out of the depot, (interrupted)

"Q. You didn't see him what he did?

"Mr. Rawlings: Let him finish answering the question Mr. Lile before you interrupt him.

"A. Because when I came out of the depot he was down there on the track, he was going down the track. I couldn't see him when I was in the depot.

"Q. Okay, how many minutes would you say elapsed from the time you first got hung up and when you went into the depot?

"A. Oh, it wasn't but a few, just long enough to walk down there.

"Q. I believe you stated on direct examination that the overall time, from the time that you got hung up until you were coming out of the depot was about fifteen minutes?

"A. Approximately, yes.

"Q. Is that correct?

"A. That's right.

"Q. And you said you were in the depot from five to ten minutes, I'm not sure?

"A. Well, it could have been. It could have been two, it could have been six. Whatever it took long enough for him to call down there and him go, we got out of the depot.

"Q. But overall it took about fifteen minutes?

"A. Well, approximately, I mean I didn't time it.

"Q. You really don't know exactly what the third truck driver did after you got hung up did you?

You didn't see him in his truck or his truck wasn't moving was it?

"A. No. It was parked."

Arden Vasser, a witness called out of turn by the railroad estimated that the train went a car and a half or two cars after it hit Untiedt's truck. At this point in the trial, Untiedt introduced the railroad company's answer to his interrogatories as follows:

"Q. Now during the past fifteen years, state the dates and owners thereof of all vehicles which were hung while down Highway 88 at this crossing mentioned in plaintiff's complaint.

"Answer: September 10, 1964, S. P. Conners. September 2, 1966 Willis Untiedt.

"Q. No. 10. State where the train station at Altheimer is located with reference to the crossing mentioned in plaintiff's complaint.

"Answer: North edge of Station is 215 feet South of crossing.

"Q. State the name and address of all employees of St. Louis Southwestern Railway Lines who were working in or near this station at the time of the collision mentioned in plaintiff's complaint.

"Answer: L. K. Baker, 1115 Pine Street, Pine Bluff, Arkansas.

"Q. State what was done by such employees to warn the approaching train that plaintiff's truck was hung on the crossing.

"Answer: The operator of the vehicle, Willis Untiedt, informed the Relief Agent, L. K. Baker,

that his trailer was hung up in the street with the tractor fouling the track, and Mr. Baker telephoned the Chief Dispatcher in Pine Bluff, who advised him that a North bound train was closely approaching the Altheimer station. The Chief Dispatcher informed Mr. Baker that the North bound train had already passed the last signal and the train crew could not be warned by signals of the existing condition at the crossing. Therefore, Mr. Baker started running in the direction of the approaching train, waiving a red flag in an effort to stop the train short of the crossing.

"Q. State the speed of the train at the time it struck plaintiff's truck.

"Answer: Approximately 3 to 5 miles per hour.

"Q. How far was such train from the crossing when its brakes were applied?

"Answer: Approximately 800 feet.

"Q. Was the emergency brakes applied?

"Answer: Yes.

"Q. Who applied the brakes and what is his title?

"Answer: E. P. Shanafelt, Locomotive Engineer.

"Q. For what distance could the employees of the train see the crossing and plaintiff's truck prior to the collision?

"Answer: Approximately 700 feet.

"Q. What obstruction or obstructions prevents from seeing further down the track?

"Answer: Altheimer depot."

Mr. Ernest Johnson the fireman testified that the train consisted of 112 or 115 cars and that he was sitting in the fireman's seat on the left hand side. The train commenced to blow its whistle at the Cotton Center crossing some 15 pole lengths from the highway crossing. When the train reached the section foreman's house, 9 pole lengths from the highway crossing, he saw somebody running up the track waving his arms. At this point he could not see the highway crossing because of the depot. He says the emergency brakes were applied at a point 8 pole lengths west of the crossing at a time when the train was running at a speed of 45 miles per hour (66 ft. per second). He estimated the speed of the train at the time of collision to be 5 miles per hour. He said, "I thought we was going to get stopped but we didn't quite make it". Mr. Johnson testified that the first time he saw Ralph Cratin, Cratin was at a point near Olive Street running down the railroad tracks waving his arms (approximately 500 feet west of the Main Street crossing). He says there was a gradual curve in the railroad starting about the point where he saw Cratin. On cross-examination he said you could see a person a half mile clear enough to distinguish a man from a woman or child and that a person running was much more easily seen than a person standing still.

Exhibit No. 7, a plat of the Altheimer station, indicates that the tracks are relatively straight from the Cotton Center crossing to a point some 200 feet east of the place where Johnson says he saw Cratin, and only a gradual curve from that point to the depot.

In *Lovegrove* v. *Missouri Pacific Railroad Co.*, 245 Ark. 1021, 436 S.W. 2d 798 (1969), we held:

"When the asserted negligence is a failure to keep a constant lookout the carrier is entitled to a directed verdict if the undisputed testimony of the

train crew shows that such a lookout was being kept. *St. Louis-San Francisco Ry.* v. *Spencer*, 231 Ark. 221, 328 S.W. 2d 858 (1959). But the jury may disregard the crew's testimony when it is inconsistent within itself or contrary to other accepted testimony in the case. *Railway Co.* v. *Chambliss*, 54 Ark. 214, 15 S.W. 469 (1891).

In this case too, Johnson testified that he was keeping a proper lookout but when his testimony is considered in connection with the plat and testimony of the other witnesses we find that a jury question was made on the lookout issue. Untiedt testified that a person from Cratin's position, that is, west of the depot, could see a train for two miles. Johnson did not testify that he saw Cratin when he first came on the track or that there was any obstruction to prevent him from seeing him a few seconds prior to the time that he actually observed him. When we consider that the train was traveling at a speed of 66 feet per second, and that it only lacked a 100 or 150 feet of being stopped in time to avoid the collision, we find that under the circumstances there was sufficient evidence to go to the jury on the issue of whether a proper lookout was being maintained. This is particularly true in a case such as this where Cratin had to be on the tracks or in the vicinity thereof for a period in excess of 10 seconds to have run to the point described by the fireman. For this reason we hold that the trial court was in error in directing a verdict for the railroad.

We find no merit in Untiedt's contention that the railroad had a duty to maintain the highway approaches to the railroad tracks. To support his contention, Untiedt relied upon Ark. Stat. Ann. § 73-614 (Repl. 1957) and *St. Louis, Iron Mt. & Southern Railway Co.* v. *Smith*, 118 Ark. 72, 175 S.W. 415 (1915) and *Payne* v. *Stockton*, 147 Ark. 598, 229 S.W. 44 (1921). However, by the Acts of 1929, No. 65 § 59, an Act to Amend and Codify the Laws Relating to State Highways (Ark. Stat. Ann. § 76-517 [Repl. 1957]), it was provided:

950

"It shall be the duty of the members of the Highway Commission and of the State Highway Engineers, on all trips in the State to particularly observe crossings of railroads on State highways, and it shall be the duty of all railroad companies and the owners of tramroads whose lines intersect or cross any of the highways of the State to improve that part of the roadway between their tracks and to the end of the cross ties on each side with the same material (wherever practicable), with the same foundation and surface as that in the adjoining portions of the roadway and to maintain such crossings in a good state of repair, and said Highway Commission shall have power and authority to require any and all railway companies to build and construct roads under their tracks at such crossings as in the judgment of the Commission will be for the best and safest interest of the traveling public.* * *''

As we interpret this statute it limits the duty of all railway companies whose lines intersect or cross any of the highways of the state to improve all of that part of the roadway between their tracks and to the end of the cross ties on each side and relieves them from any duty of maintenance beyond the end of the cross ties.

Reversed and remanded.